IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD ERWIN WALKER,

Petitioner, No. CIV S-09-525 WBS CHS P

vs.

J. HAVILAND,

Respondent. FINDINGS AND RECOMMENDATIONS

_______________________________/

## I. INTRODUCTION

Petitioner Richard Erwin Walker is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner is currently serving a sentence of 18 years to life following his conviction in Riverside County for second degree murder with use of a firearm. Here, petitioner challenges the execution of his sentence, and specifically, the September 20, 2007 decision of the Board of Parole Hearings that he was not suitable for parole. The petition presents various grounds for relief, each contesting the Board's denial of parole as a violation of due process. Based on a thorough review of the record and applicable law, it is recommended that the petition be denied. The Board's 2007 decision to deny parole was supported by some evidence in the record and accordingly did not violate petitioner's right to due process of law.

## II. BACKGROUND

Although petitioner declined to discuss the circumstances of his commitment offense at his 2007 parole suitability hearing, the following facts were set forth by the presiding commissioner and considered by the panel:

> On November 20, 1988, the inmate [petitioner], along with another unknown male, contacted the victim, David Ringo, to arrange a meeting. Inmate suspected the victim of stealing his radio and wanted to confront the victim about it. When they arrived at the meeting location, the inmate confronted Ringo about his radio. The victim told Walker he did not steal the radio and that he would not do something like that to him. The inmate then pointed a gun at the victim [and] told him to get down on his knees. The victim pled for the inmate not to shoot him. The inmate told the other male who was there to kick him. The victim then stood up and began running. Inmate fired one shot from the gun, and the victim fell to his knees -- collapsed and [fell] face first on the ground. It appear[ed] that the victim was not breathing, and... the inmate then told the other male to get his pickup truck. They loaded the body into the truck, and subsequently dumped the body in some orange groves. The workers of the ranch found the body the following day.

(Pet. Ex. A at 15-16.)

Petitioner pleaded guilty to second degree murder with use of a firearm and was sentenced to a term of 18 years to life in state prison. His minimum eligible parole date passed on October 12, 2000. On September 20, 2007, a panel of the Board of Prison Terms ("Board") conducted a hearing to determine petitioner's suitability for parole and concluded that he would pose an unreasonable risk of danger to society or a threat to public safety if released and thus that he was not suitable for parole.

Petitioner challenged the Board's decision in a petition for writ of habeas corpus to the Riverside County Superior Court. The petition was denied without a written opinion on June 20, 2008. Subsequent petitions filed to the California Court of Appeal, Fourth District, and the California Supreme Court were likewise denied.

/////

/////

III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

IV. DUE PROCESS

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution does not, in and of itself, create a protected liberty interest in receipt of a parole

date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  If a state's statutory parole scheme uses mandatory language, however, it "creates a presumption that parole release will be granted" when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).

In California, Penal Code section 3041 sets forth the legislative standards for determining parole for life-sentenced prisoners such as petitioner.  Subsection (a) provides that "[o]ne year prior to the inmate's minimum eligible parole release date a panel... shall meet with the inmate and shall normally set a parole release date." Cal Penal Code §3041(a).  Subsection (b) provides an exception to the regular and early setting of a lifer's term, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration..." Cal. Penal Code §3041(b).  Due to the mandatory language in the statute, California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz*, 442 U.S. at 16.

Additionally, as a matter of *state* constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating future dangerousness. *Hayward v.*

*Marshall*, No. 06-55392, slip op. at 34-35 (9th Cir. April 22, 2010) (en banc) (citing *In re Rosenkrantz*, 59 P.3d 174, 210 (Cal. 2002), *In re Lawrence*, 190 P.3d 535, 549 (Cal. 2008), and *In re Shaputis*, 190 P.3d 573, 582 (Cal. 2008)). The federal Due Process Clause requires, in turn, that California comply with its own quantum of evidence requirement for parole suitability determinations. *See Pearson v. Muntz*, No. 08-55728, slip op. at 5 (9th Cir. May 24, 2010) (per curiam). A court reviewing a California inmate's due process claim in the parole context must "decide whether the California judicial decision approving the... decision rejecting parole was an "unreasonable application" of the California 'some evidence' requirement, or was "based on an unreasonable determination of the facts in light of the evidence." *Hayward v. Marshall*, slip op. at 37. This analysis is framed by the state's statutes and regulations governing parole suitability determinations. *See Irons*, 505 F.3d at 851.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers. The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008). The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. §2402(b). The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. 15 Cal. Code Regs. §2402(c)-(d). The overriding concern is public safety and the focus is on the inmate's *current* dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205. The relevant question is not whether some evidence supports the reasons

cited for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety. *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008). In other words, there must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. *In re Lawrence*, 44 Cal. 4th at 1227.

Here, the panel of the Board presiding over petitioner's 2007 hearing articulated both positive and negative factors bearing on his suitability for parole. The Board commended petitioner for his institutional activities and conduct. Petitioner had consistently received above average work reports for his job assignments. He completed two or three vocational certifications. He had recently begun community college course work and had completed a psychology class. His record was free of serious discipline since 1998. He participated regularly in NA and AA and completed other self-help programs such as anger management, Breaking Barriers, Pride Project and stress management. The most recent psychological evaluation available to the Board was supportive of release in that the evaluator indicated petitioner's "ability to perform in the free society" was good and his "risk of recidivism" was low.

Ultimately, however, the Board decided against releasing petitioner. The Board appeared to rely on the following factors in concluding that petitioner was not suitable to be released on parole: (1) the circumstances of his commitment offense; (2) his criminal history; (3) his lack of realistic parole plans; and (4) his past and present attitude toward the crime and lack of insight into previous criminality.

Under the applicable state regulations, the circumstances of a prisoner's commitment offense tend to show unsuitability for parole for where the offense was committed "in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. §2402(c)(1). Here, the Board appeared to find that petitioner's offense qualified as especially heinous, atrocious, or cruel because it was carried out in a dispassionate and calculated manner (§2402(c)(1)(B)), and because it demonstrated an exceptionally callous disregard for human suffering (§2402(c)(1)(D)).

/////

In order for the facts of petitioner's commitment offense to constitute a valid reason to deny parole, there must be some rational nexus between those facts and the ultimate conclusion that he continues to be a threat to public safety. *In re Lawrence*, 44 Cal.4th at 1214, 1227 ("the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or [ ] current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety") (emphasis in original). The relevant inquiry is an individualized one: "whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." *In re Lawrence*, 44 Cal.4th at 1221. The passage of time and attendant changes in the inmate's psychological or mental attitude are relevant considerations. *Id*.

In this case, the Board articulated other negative factors bearing on petitioner's suitability for parole. These other factors demonstrate a sufficient nexus between petitioner's 1988 offense and the Board's ultimate conclusion that he still posed a risk of danger or threat to the public at the time of his hearing in 2007. These other factors also independently demonstrate some evidence in the record supporting a conclusion that petitioner was not suitable for parole.

The Board considered petitioner's criminal history and found that his offense was part of an escalating pattern of criminal conduct. A prisoner's previous record of violence tends to show unsuitability for parole where "on previous occasions [the prisoner] inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." 15 Cal. Code Regs. §2402(c)(2). A prisoner's entire criminal history, including involvement in any reliably documented criminal misconduct, is additionally relevant under section 2402(b). Here, the Board noted that petitioner had served a

prior prison term and that he was on parole at the time of his offense.  The Board found that petitioner had "numerous previous grants of probation and parole" and thus that he had "failed to profit from society's previous attempts to correct his criminality."

The Board also considered pursuant to 15 Cal. Code Regs. §2402(b) petitioner's past and present attitude toward his commitment offense.  Based on the some of petitioner's comments at the hearing, the Board questioned whether he had gained sufficient insight into his commitment offense, previous criminality, and misconduct in prison.  Petitioner was questioned as follows:

> PRESIDING COMMISSIONER BIGGERS: All right, thank you. Just a couple of follow-up questions.  This ride that took place back when you had that 115, you want to tell me about that?
>
> INMATE WALKER: What had happened was I came out of work change, and I seen about 100 inmates -- black inmates coming into the white area, and there was about 100 white inmates, and they were coming, and I just ran up and ran by the whites and right into it, and didn't even know what it was about or anything, and the yard went down.  Nothing actually happened.
>
> PRESIDING COMMISSIONER BIGGERS: Uh-huh.
>
> INMATE WALKER: And because I ran out there like that, I got it for leading a racial riot.
>
> PRESIDING COMMISSIONER BIGGERS: Okay, and you were not involved.
>
> INMATE WALKER: Well, I ran out there.
>
> PRESIDING COMMISSIONER BIGGERS: Okay, to get involved?
>
> INMATE WALKER: Well, I ran in that direction, yeah.
>
> PRESIDING COMMISSIONER BIGGERS: Okay.  There was also some discussion in your previous hearing with Presiding Commissioner Farmer that talks about anger.  Can you describe what took place in that hearing that would have made you -- made them get the perception that there was anger, you still had some anger issues?
>
> INMATE WALKER: I don't know why they came up with that.

PRESIDING COMMISSIONER BIGGERS: Well, when I read the previous transcript, it -- I think the deputy commissioner was asking you certain questions about different things that were in your past, and you felt that they were beating up on you a little bit is what I sort of gathered. Do you recall that?

INMATE WALKER: No, it was a pretty rough hearing, but --

PRESIDING COMMISSIONER BIGGERS: Well... my point is that you get out there in society, somebody does something to you that you don't like, how you going to be able to handle that?

INMATE WALKER: Well, I'm going to use my head and I'm going to think about --

PRESIDING COMMISSIONER BIGGERS: Well, you didn't use your head [at the last parole hearing] according to what I read there.

INMATE WALKER: I don't know what I did there. It was just body language or something that they said I had anger issues.

PRESIDING COMMISSIONER BIGGERS: Well, okay, let's just -- let me just -- well, they start talking about a bunch of things, and I'll find that for you, but did you go back -- did you read that -- the transcript?

INMATE WALKER: No.

PRESIDING COMMISSIONER BIGGERS: Why didn't you read the transcript?

INMATE WALKER: I read it right after I got it.

PRESIDING COMMISSIONER BIGGERS: Okay. You don't recall what it said about that? When she was talking about -- let's see here --

DEPUTY COMMISSIONER ENLOW: I have the CDC 115 in front of me, and one thing that jumps out is that it states in here that you, Mr. Walker, you were described as turning to a group of about 40 white inmates and stating let's go. Those were in quotes, "Let's --

INMATE WALKER: Yeah.

DEPUTY COMMISSIONER ENLOE: -- go."

INMATE WALKER: That's what --

DEPUTY COMMISSIONER ENLOE: (inaudible)

INMATE WALKER: -- THEY SAY.

DEPUTY COMMISSIONER ENLOE: -- part?

INMATE WALKER: I don't recall. I don't remember saying let's go, I just ran out there, and I was -- that's what an officer said that I said, but there was other officers that said that they didn't -- that I didn't do that, but I was found guilty.

PRESIDING COMMISSIONER BIGGERS: That don't sound like 100, though.

INMATE WALKER: Well, I don't know. You have to -- there's a report that has everybody's names listed and there's -- it's about 100 black and about 100 white.

PRESIDING COMMISSIONER BIGGERS: Well, that was back awhile, so I'm not going to really dwell on it, but I just need to know what that was all about.

INMATE WALKER: I really don't know what it was about. I just rain out there. When they started coming, I ran to face it.

PRESIDING COMMISSIONER BIGGERS: Ran to face it. Well, why would you do that if you didn't know what it was about?

INMATE WALKER: Because there was a whole lot of people coming towards my people, and they're (inaudible)

PRESIDING COMMISSIONER BIGGERS: What do you mean your people?

INMATE WALKER: White people and --

PRESIDING COMMISSIONER BIGGERS: White --

INMATE WALKER: -- black people.

PRESIDING COMMISSIONER BIGGERS: -- people, black people --

INMATE WALKER: It was black --

PRESIDING COMMISSIONER BIGGERS: -- were fight --

INMATE WALKER: -- and white.

PRESIDING COMMISSIONER BIGGERS: Well, I mean, there's a lot of -- you know --

INMATE WALKER: It's racial in here. You know, I mean, who's

going to fool -- I'm not trying to fool anybody. It's (inaudible)

PRESIDING COMMISSIONER BIGGERS: No, I know it's racial in here, but if you were not involved and didn't know what was going on, why'd you get involved if they wasn't coming after you.

INMATE WALKER: They were coming after me because of my skin color. The blacks were coming towards the white area. I was coming out into the white area.

PRESIDING COMMISSIONER BIGGERS: Yeah, but you could have easily left and departed the area, could you have not?

INMATE WALKER: Yes, I could have.

PRESIDING COMMISSIONER BIGGERS: But you didn't want to do that. Okay. And that goes back to -- and again, I'm not getting into your crime area, but just reading some of your social history how you felt that you needed to do certain things and take care of certain things. And, again, without getting into your -- the crime itself. What happens out there once you're out in society?

INMATE WALKER: Well, if I see people, like a gang of people coming towards you or your family, I'm going to jump in there and help you too.

PRESIDING COMMISSIONER BIGGERS: Okay. You are?

INMATE WALKER: Yeah, but I'm not going to use a weapon or anything. I'm (inaudible)

PRESIDING COMMISSIONER BIGGERS: Well, how are you going to get in there and help us? What are you doing to do, jump up there and decide you're going to hit them with --

INMATE WALKER: Probably get --

PRESIDING COMMISSIONER BIGGERS: -- your fist --

INMATE WALKER: -- my butt beat, but -- you know -- at least I'll try.

PRESIDING COMMISSIONER BIGGERS: Yeah, but see, have you ever heard of just getting away from the whole situation?

INMATE WALKER: I can't leave people that are in trouble like that.

PRESIDING COMMISSIONER BIGGERS: Without knowing all the -- why the person got in trouble?

INMATE WALKER: You can -- you could tell when it's a bad situation.

PRESIDING COMMISSIONER BIGGERS: Not necessarily so. I've gotten myself into some situations that were bad that I didn't feel that I -- you know -- put myself in that situation and let that happen, but at the same time, there are ways to get out of it. But you're telling me that you would just jump in?

INMATE WALKER: Well, I would -- I'd run over there and try to stop it, but if it was happening, it would be happening.

PRESIDING COMMISSIONER BIGGERS: All right. Well, see, that's an issue that concerns me because you haven't learned to walk away from that type of stuff yet, and -- now, I mean, please comment on that. I -- you can't continually get yourself involve din things that necessarily bother -- if it's not your fight, why get in it?

INMATE WALKER: Just can't turn my back on somebody that needs help.

PRESIDING COMMISSIONER BIGGERS: Despite what the help might be.

INMATE WALKER: Well, to a point, you know. I --

PRESIDING COMMISSIONER BIGGERS: Well, I'm --

INMATE WALKER: -- don't want to hurt anybody. I'm not looking to -- I don't want to harm anybody, but I --

PRESIDING COMMISSIONER BIGGERS: If you go --

INMATE WALKER: -- don't want to --

PRESIDING COMMISSIONER BIGGERS: -- over there and you --

INMATE WALKER: -- watch somebody get harmed either.

PRESIDING COMMISSIONER BIGGERS: Well, why don't you just call the police?

INMATE WALKER: Now I guess I would.

PRESIDING COMMISSIONER BIGGERS: Well, that's not what you said, though. You said that you would go over there and get involved because you don't want to see anybody -- you know -- anybody take advantage of whatever of somebody -- you know -- and that's a problem. You should have learned that in your anger

management classes. You don't agree?

INMATE WALKER: I don't agree.

PRESIDING COMMISSIONER BIGGERS: You don't agree. Okay.

(Pet. Ex. A at 47-54.)

Based on the above exchange, the Board questioned the low risk assessment score assigned by the most recent psychological evaluator:

> [T]he psychological evaluation... dated April the 7th, 2005, by Dr. Stephanie Wagner... was supportive in that it basically said the following: That your ability to perform in free society is good and your risk of recidivism is low. However, you know, from some of your comment today, we think that may need to be reevaluated, and I'm going to ask for a new psychological evaluation for you, sir, to talk about that, primarily because of some of the comments you made today, and what was surprising was when I asked you, one, what your triggers were, you were not able to just tell us what they were. In addition to that, I mentioned to you the fact that what if you got involved with a situation similar to what you had before, and your answer was something to the effect that well, I would go and help them -- I would do this that and the other -- which is an indication to this Panel that you still have the same mentality that you had before that you had to take things and do things a certain way, the way that you know how to do them. That is a concern because you haven't learned anything. You've been going to all of these classes on anger management, stress management and the whole thing, and it could have been so much easier for you to say I would go to the authorities, there's no phone there, I'd do this or that or the other, but you came right out and basically said I would get involved. And I went on even further to suggest to you what about if this took place, and you said well we have a difference of opinion on that. Which is an indication to this Panel that you still have this belief that you have to do things a certain way -- good, bad or indifferent -- and that's something I think the (inaudible) need to really go in to help you understand that you cannot go around doing things like that. You've got to be able to say I just walk away. I'm not going to go over there and help anybody, regardless of what the situation might be. The doctor also said -- and I'm quoting again -- that in comparison to other minimum security inmates, inside or outside a controlled setting, your assessment is also considered to be lower. Your levels of dangerousness would increase... if you begin abusing alcohol, and I don't think that's going to be the issue at all. I don't think alcohol is the issue. I think the issue is your mindset on thinking you have to help others if you see a situation arising that you feel that you're

going to get involved with.

(Pet. Ex. A at 83-85.)

A prisoner's remorse or demonstrated understanding of the nature and magnitude of the commitment offense is factor tending to indicate the prisoner is suitable for release. 15 Cal. Code Regs. §2402(d)(3). The Board is likewise authorized to consider a prisoner's lack of remorse, understanding or insight under section 2402(b) ("The Board is directed to consider all relevant, reliable information available regarding... past and present attitude toward the crime... and any other information which bears on the prisoner's suitability for release.") The Board properly weighed what it considered to be petitioner's lack of insight into his life crime and previous criminality.

The Board also relied on petitioner's lack of realistic parole plans. A prisoner's understanding and plans for the future are a parole suitability factor where "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." Here, it is undisputed that petitioner obtained marketable skills while incarcerated through completion of more than one vocational certificate. On the other hand, he presented no residential or employment plan in the state of California if paroled. Petitioner wanted to live with his wife in Oregon, but had not initiated any of the procedures for transferring his parole to the state of Oregon, an option that could possibly be available, but was not guaranteed. In this regard, the Board characterized his parole plans as "for all practical purposes... nonexistent."

A prisoner's understanding and plans for the future are, notably, a parole *suitability* factor, as opposed to being an unsuitability factor where there are no such plans. Again, though, the Board is authorized to consider any information which bears on petitioner's suitability for release. 15 Cal. Code Regs. § 2281(b). A complete lack of evidence that petitioner has a place to live, employment opportunities, or any support whatsoever, including emotional support, from friends or family in California bears negatively on a determination of his suitability. Petitioner's failure to demonstrate realistic plans for parole, or any serious attempts at

making such plans, were factors appropriately considered by the Board. A conclusion that petitioner presents a risk of danger to society if released because he has no demonstrated plans for the future has support in the record.

The Board concluded:

> The Panel makes the following findings: That first of all, you need to examine your belief and theory that -- and understand the causative factors that allow you to get involved in situations that could produce negative outcomes, that you need to develop and explore and understand the procedures that will allow you to be paroled to the state of Oregon so that you can come up and do viable parole plans, and also you need to be able to recognize those triggers -- those factors that could trigger your impulses to commit a crime similar to this based on what you indicated to us today. Nevertheless, we want to commend you for being a Braille transcriber, for being a computer technician, getting a completion of upholstery, being disciplinary-free since '99, your participation in NA and AA, anger management, Breaking Barriers, and Stress Pride. However, these positive aspects of your behavior do not outweigh the fact of unsuitability.

(Pet. Ex. A at 87.)

There is some evidence to support the Board's conclusion that petitioner was not suitable for parole at the time of his 2007 suitability hearing. The nature of petitioner's commitment offense, considered together with his criminal history, lack of insight or understanding, and failure to demonstrate realistic parole plans provide the required modicum of evidence to support the Board's 2007 denial of parole. The Board's decision withstands the minimally stringent "some evidence" test and has not violated petitioner's right to due process of law.

## V.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file


written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 9, 2010

Charlene H. Sorrentino
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE